*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

CHRISTOPHER MICHAEL SHANANAQUET
a/k/a CHRISTOPHER MICHAE SHANANAQUET,

      Defendant-Appellant.

UNPUBLISHED
August 12, 2021

No. 350861
Newaygo Circuit Court
LC No. 17-011599-FH

Before: TUKEL, P.J., and K. F. KELLY and GADOLA, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of nine counts of first-degree criminal sexual conduct (CSC-I) (victim less than 13 years old), MCL 750.520b(1)(a). He was sentenced as a fourth-offense habitual offender, MCL 769.12, to 300 months to 60 years' imprisonment for each charge, to be served concurrently. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

In December 2016, defendant was serving a prison sentence resulting from his no-contest plea to attempted criminal sexual conduct. At that time, defendant sent a four-page letter received by the Michigan State Police post in Lakeview, identified on its cover page as a "Sexual Assault Complaint." Defendant alleged in the letter that, in 2008 or 2009, his estranged wife[1] manipulated him through drugs and restraints into engaging in sexual acts with the victim, then a relative by marriage under the age of 13. Defendant portrayed his estranged wife as a dominant and controlling individual who created a continuing sexual relationship between the minor victim and defendant that lasted for years. Defendant alleged that he eventually "just gave in and accepted it for what it was." According to defendant, the "relationship"

---

[1] At the time of trial, defendant's estranged wife had divorced him, and she had remarried someone else. For consistency purposes, the phrase "estranged wife" refers to defendant's now ex-wife.

with the victim continued during defendant's incarceration through the use of "pen names and coded messages," letters, cards, e-mails, and provocative pictures.

Defendant claimed that he wrote the letter because he was concerned for his son, whom he wanted to protect from his estranged wife. His son was approaching the age the victim had been at the time that defendant's estranged wife initiated the sexual relationship between defendant and the victim. The letter concluded by identifying evidence that might be available at a trailer in Cedar Springs. Defendant also sent 50 to 60 documents purportedly supporting his account to Children's Protective Services investigator McKenzie Wyrick at the Department of Health and Human Services (DHHS).

Michigan State Police Trooper Larry Andres interviewed defendant at Parnell Correctional Facility for approximately three hours. Trooper Andres testified at defendant's trial that defendant explained the letter "almost line for line, sometimes word for word." According to the trooper, defendant "started to get a little upset . . . kind of crying almost," but the emotions seemed rehearsed. Subsequently, Trooper Andres and Wyrick interviewed defendant's estranged wife and the victim, who at the time was 19 years old. The victim eventually disclosed that defendant sexually abused her from the time he moved into her family's home until he went to prison. She explained that she did not disclose the sexual abuse because defendant was verbally and physically abusive and threatened harm to her family if she disclosed the abuse. The deterioration of defendant's relationship with his estranged wife provided a motive for defendant to act in bad faith. Defendant's estranged wife continued to have a relationship with defendant while imprisoned; she wrote him letters, sent him photographs, spoke to him on the phone, visited him in prison with her children, and deposited money into his prison account. However, defendant's estranged wife became frustrated with his demands and arguments and notified him of her intent to cut off contact and seek a divorce. Thus, defendant lost his ability to control his estranged wife and the victim. Ultimately, defendant's disclosure of the inappropriate sexual relationship with the victim led to these charges and convictions.

Defendant, who represented himself with the assistance of advisory counsel, filed three motions pertinent to the present appeal. Defendant moved the trial court to suppress the December 2016 letter and any statements or evidence obtained in the investigation of its contents.[2] Defendant asserted that the letter he sent to the state police and the documents he sent to DHHS constituted a report of suspected child abuse and, therefore, he was entitled to the qualified immunity granted by § 5 of the Child Protection Law (CPL), MCL 722.621 *et seq.*, to persons making such reports. Defendant insisted that any statements regarding sexual contact between him and the victim were made to provide context for his concern about his son's environment, to establish the nature of the child abuse and the manner in which future abuse might occur, and to identify the people involved in the abuse.

The prosecution argued to the contrary that, even if defendant's letters to the state police and DHHS were construed as reports made under the CPL, MCL 722.625 granted immunity for civil and criminal liability that might arise from the act of reporting, but did not immunize defendant from criminal prosecution for the underlying claims of the sexual penetration of the victim. The prosecution also argued that defendant did not make the reports in good faith. Rather, defendant raised the claim of abuse after he realized that the victim and his estranged wife had cut off contact with him in a misguided attempt to

---

[2] Defendant moved multiple times to suppress the December 2016 letter and any statements or evidence flowing from it. At issue here is defendant's renewed and amended motion of May 11, 2018.

deflect blame from himself and obtain immunity to which he was not entitled. After hearing oral argument, the trial court denied defendant's motion, finding "that the report was not made in good faith."

Defendant also moved the trial court for funds to hire an expert witness in, among other things, forensic interview protocols. Defendant maintained that, because credibility would be central in this case, he needed an expert to attack the victim's credibility and the integrity of the interview process. He proposed to show that the victim's memories and testimony were neither reliable nor credible, and that the witness interviews were "improper, suggestive, coercive and tainted." In a supporting brief, defendant asserted, without further explanation, that the trial court "must necessarily" recognize that credibility and reliability were central and "must conclude" that the centrality of these issues called for an expert witness. Defendant further asserted that, without the assistance of an expert witness, he would be denied the right to meaningful and informed cross-examination of the prosecution's witnesses and the right to call witnesses of his own and, therefore, could not proceed safely to trial.

In opposition to the motion, the prosecution argued in pertinent part that defendant failed to show what facts in the instant case the jury would be unable to consider adequately without the testimony of an expert witness. The prosecution observed that credibility assessments are integral to every criminal proceeding, and that it had long been established that it was the jury's role to assess a witness's credibility. After oral argument, the trial court denied defendant's motion, initially relying on *People v Tanner*, 469 Mich 437, 443; 671 NW2d 728 (2003), overruled by *People v Kennedy*, 502 Mich 206; 917 NW2d 355 (2018). However, while defendant's motion had been pending in the trial court, the Michigan Supreme Court issued *Kennedy*, which overruled *Tanner*. Consequently, defendant moved for reconsideration of the court's decision under the analytical framework provided by *Kennedy*. After oral argument, the trial court again denied defendant's motion, determining that defendant had not met *Kennedy*'s requirement to demonstrate both a reasonable probability that the requested experts would be of assistance to the defense and that denying the motion would result in an unfair trial.

In addition, defendant moved to quash the bindover and for dismissal of the charges against him. Defendant argued that the charges against him lacked sufficient specificity to allow for adequate investigation and the preparation of a defense. The preliminary examination did not provide a more definite range of dates or tie any of the incidents to specific dates or identifiable locations. Defendant asked the trial court to either quash the bindover and dismiss the information, or to reduce the charges in the information. The prosecution argued in response that defendant's motion was essentially a reiteration under a different title of his previously filed and denied motion for a bill of particulars. Agreeing with the prosecution, the trial court denied defendant's motion.

After a four-day trial, the jury took less than 45 minutes to convict defendant on all charges. At the sentencing hearing, defendant objected to imposition of a 25-year mandatory minimum sentence and lifetime electronic monitoring because those sentencing requirements became available only in 2006,[3] and the felony information stated that the abusive conduct began in 2005. The trial court found that the incidents occurred after the effective date of the amendment and, therefore, that the 25-year minimum and lifetime electronic monitoring applied. Defendant now appeals.

---

[3] 2006 PA 169, effective August 26, 2006.

## II. AMENDED MOTION TO SUPPRESS

Defendant first alleges that he is entitled to the qualified immunity provided by MCL 722.625 for reporting his reasonable suspicion that his son was at risk of child abuse. Therefore, the trial court erred by denying his amended motion to suppress statements that he made in his report and that were obtained as a result of investigating the report's allegations. We disagree.

"A trial court's ruling on a motion to suppress evidence is reviewed for clear error, but its conclusions of law are reviewed de novo." *People v Unger*, 278 Mich App 210, 243; 749 NW2d 272 (2008). "Clear error exists when some evidence supports a finding, but a review of the entire record leaves the reviewing court with the definite and firm conviction that the lower court made a mistake." *In re Baham*, 331 Mich App 737, 751; 954 NW2d 529 (2020) (quotation marks and citation omitted). This Court reviews de novo whether the trial court properly interpreted and applied the relevant statutes. *Kennedy*, 502 Mich at 213.

Under the CPL, various healthcare professionals, teachers, and other enumerated professionals are required to report suspected child abuse to law enforcement or to the DHHS. MCL 722.623. "In addition to those persons required to report child abuse or neglect under [MCL 722.623], any person, including a child, who has reasonable cause to suspect child abuse or neglect may report the matter to the department or a law enforcement agency." MCL 722.624. The CPL shields all persons who report suspected child abuse from civil or criminal liability arising from making such reports as stated in MCL 722.625, which provides in pertinent part:

> A person acting in good faith who makes a report, cooperates in an investigation, or assists in any other requirement of this act is immune from civil or criminal liability that might otherwise be incurred by that action. A person making a report or assisting in any other requirement of this act is presumed to have acted in good faith. *This immunity from civil or criminal liability extends only to acts done according to this act* and does not extend to a negligent act that causes personal injury or death or to the malpractice of a physician that results in personal injury or death. [Emphasis added.]

MCL 722.625 clarifies "that the grant of immunity applies only to acts required by the Child Protection Law[.]" *Lee v Detroit Med Ctr*, 285 Mich App 51, 64; 775 NW2d 326 (2009). For a report made in good faith, the statute immunizes a person making a report from civil and criminal liability arising from the act of reporting or of cooperating in subsequent investigations. See *Warner v Mitts*, 211 Mich App 557, 560; 536 NW2d 564 (1995) ("Immunity extends not only to the making of the report but also to a party's cooperation in an investigation."). Accordingly, if a doctor were sued for wrongful reporting, MCL 722.625 affords the doctor statutory immunity from civil liability. However, if the doctor were sued for medical malpractice for allegedly failing to correctly diagnose and treat the child, MCL 722.625's immunity provision would not protect the doctor. *Lee*, 285 Mich App at 64.

A person who has "reasonable cause to suspect child abuse" is presumed to be acting in good faith. *Warner*, 211 Mich App at 559; MCL 722.625. However, a person presented with a reasonable suspicion of child abuse may not determine the validity of the allegations because this determination is "for the responsible investigative agencies." *People v Cavaiani*, 172 Mich App 706, 715; 432 NW2d 409 (1988). Further, a person may decide that the allegations are untrue, but "he is not free to arrogate to himself the

right to foreclose the possibility of a legal investigation by the state. The state has different interests, and its sovereignty is offended by child abuse." *Id.*

Defendant submits that a fair reading of the statute entitles him to qualified immunity from criminal prosecution arising from statements he made in the December 2016 letter/report to the state police and to the DHHS. He asserts that he made the report because he had reasonable cause to suspect that his son was being abused by his estranged wife, and that he included statements about his sexual contact with the victim to provide context for his suspicions. Accordingly, he claims entitlement to immunity from civil and criminal liability that might otherwise be incurred by reporting the suspected abuse.

Contrary to defendant's assumption, nothing in the plain language of MCL 722.625 conveys immunity from criminal prosecution for voluntary and unsolicited *self-reports* of sexual abuse against a minor. See *People v Mineau*, 194 Mich App 244, 248-249; 486 NW2d 72 (1992). The immunity granted by the statute extends only to "acts done according to this act," i.e., 238 PA 1975, the CPL. The consequences of adopting defendant's argument would be that self-confessed child abusers could prevent criminal prosecution for their crimes by reporting their own abuse. This construction urged by defendant is simply not contained within the plain language of the CPL or permitted by the public policy of this State. *Id.* Accordingly, the trial court correctly denied defendant's renewed and amended motion to suppress his statements contained in his letter to authorities reporting the sexual abuse of the victim.[4]

### III. MOTION FOR THE APPOINTMENT OF AN EXPERT WITNESS

Defendant next asserts that the trial court abused its discretion by denying his motion for the appointment of an expert witness in forensic interviewing protocol and that denial of an expert resulted in an unfair trial. We disagree.

We review "de novo, as an issue of constitutional law implicating a defendant's due-process rights, the trial court's grant or denial of a defendant's request for state funds to retain an expert." *People v Propp*, 330 Mich App 151, 159; 946 NW2d 786 (2019). In *Kennedy*, 502 Mich at 225, our Supreme Court adopted the three factor due-process analysis in *Ake v Oklahoma*, 470 US 68; 105 S Ct 1087; 87 L Ed 2d 53 (1985), to determine when an indigent criminal defendant requires basic tools for an adequate defense that includes an adequate opportunity to fairly present his claims with the assistance of an expert:

> (1) the private interest that will be affected by the action of the State, (2) the governmental interest that will be affected if the safeguard is to be provided, and (3) the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an

---

[4] We also reject defendant's reliance on principles of due process, fundamental fairness, and public policy, citing *People v Farrow*, 183 Mich App 436; 455 NW2d 325 (1990). Defendant did not confess his sexual abuse of a child during counseling. Moreover, the public policy of allowing a counselor to disclose communications presented a public policy issue best left to and resolved by the Legislature. *Mineau*, 194 Mich App at 248. Rather, defendant admitted his sexual abuse of a child purportedly in an attempt to prevent the "fear" of the abuse of another child. Regardless of defendant's motive, he cannot foreclose the possibility of a legal investigation by the state in light of its interest in preventing child abuse. *Cavaiani*, 172 Mich App at 715. In light of our resolution of this issue, we do not address the trial court's conclusion regarding good faith.

erroneous deprivation of the affected interest if those safeguards are not provided. [*Kennedy*, 502 Mich at 215 (quotation marks and citation omitted).]

In order to determine whether an indigent defendant makes the showing necessary to obtain appointment of an expert witness, our Supreme Court adopted the reasonable probability standard set forth in *Moore v Kemp*, 809 F 2d 702 (CA 11, 1987):

[A] defendant must demonstrate something more than a mere possibility of assistance from a requested expert; due process does not require the government automatically to provide indigent defendants with expert assistance upon demand. Rather . . . a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial. Thus, if a defendant wants an expert to assist his attorney in confronting the prosecution's proof—by preparing counsel to cross-examine the prosecution's experts or by providing rebuttal testimony—he must inform the court of the nature of the prosecution's case and how the requested expert would be useful. At the very least, he must inform the trial court about the nature of the crime and the evidence linking him to the crime. By the same token, if the defendant desires the appointment of an expert so that he can present an affirmative defense, such as insanity, he must demonstrate a substantial basis for the defense . . . . In each instance, the defendant's showing must also include a specific description of the expert or experts desired; without this basic information, the court would be unable to grant the defendant's motion, because the court would not know what type of expert was needed. In addition, the defendant should inform the court why the particular expert is necessary. We recognize that defense counsel may be unfamiliar with the specific scientific theories implicated in a case and therefore cannot be expected to provide the court with a detailed analysis of the assistance an appointed expert might provide. We do believe, however, that defense counsel is obligated to inform himself about the specific scientific area in question and to provide the court with as much information as possible concerning the usefulness of the requested expert to the defense's case. [*Kennedy*, 502 Mich at 227 (quotation marks and citation omitted).]

Thus, in order to obtain state funds for an expert witness, the defendant must "show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial." *Id*. at 228.

Defendant contends that the trial court erred by denying his request for an expert in forensic interviewing protocol. However, these protocols apply to the interviewing of children regarding sexual assault and abuse "in a developmentally sensitive, unbiased, and truth-seeking manner, that will support accurate and fair decision-making in the criminal justice and child welfare systems." *People v Tesen*, 276 Mich App 134, 136; 739 NW2d 689 (2007). The victim was 19 years old when Trooper Andres interviewed her in 2017. Hence, use of forensic interviewing protocols was not required. Accordingly, there was no reasonable probability that an expert in this area would be of assistance to the defense.

Defendant also asserts that an expert was necessary "to examine whether suggestive questions and failure to adhere to protocol might have tainted [the victim's] memory regarding the allegations" and to "educate the jury regarding how suggestive questioning might lead to false ideations that solidify into

reality over time." However, the investigation that led to defendant being charged was initiated as a consequence of defendant's voluntary self-reporting of his participation in the sexual assault of the victim and his statement to the investigating officer recounting the content of his written self-report mailed to the state police and DHHS. In addition, defendant's questioning of his estranged wife and the victim tended toward eliciting information from both that there was a "romantic relationship" between defendant and the victim and that his estranged wife knew about it. In light of defendant's admission of sexual contact with the victim and his intimation that his estranged wife knew about and had encouraged their sexual relationship, defendant has not shown a reasonable probability that an expert in the suggestibility of interviews would be of assistance to the defense.

Defendant further asserts that an expert was necessary to educate him so that he would be more effective in cross-examining witnesses.[5] The record shows that defendant effectively challenged the credibility of Trooper Andres, the victim, and his estranged wife. He challenged the credibility of Trooper Andres by pointing out numerous insufficiencies in the trooper's investigation and eliciting from him the admission that he might have missed important information. Defendant effectively challenged the credibility of both his estranged wife and the victim by playing for the jury prison phone calls that suggested, contrary to their testimonies, that his estranged wife was aware of his sexual relationship with the victim and that the victim was a willing participant. In light of the evidence and admissions that defendant presented to the jury, he failed to show how denial of his motion for an expert witness resulted in a fundamentally unfair trial. Consequently, defendant has not shown that the trial court abused its discretion by denying his request for the appointment of an expert.

## IV. MOTION TO QUASH THE BINDOVER

Defendant contends that the trial court erred by denying his motion to quash the bindover and erred by equating defendant's motion to quash the bindover with his previous motion for a bill of particulars. In addition, defendant contends that Judge Drake[6] abused his discretion by reviewing his own bindover decision and that, at the very least, Judge Drake should have recused himself to avoid the appearance of impropriety. We disagree.

This Court reviews a trial judge's decision on whether to recuse himself or herself for an abuse of discretion. See *People v Upshaw*, 172 Mich App 386, 389; 431 NW2d 520 (1988). "The Due Process Clause incorporated the common-law rule that a judge must recuse himself when he has a direct, personal, substantial, pecuniary interest in a case." *Okrie v Michigan*, 306 Mich App 445, 470; 857 NW2d 254 (2014) (quotation marks, citation, and alteration omitted). This rule reflects the maxim *nemo judex in*

---

[5] Although defendant chose to represent himself, standby counsel was present at trial to assist him in this regard.

[6] Defendant successfully moved to disqualify Newaygo County's only circuit court judge, Judge Robert D. Springstead, on the basis that Judge Springstead was the elected prosecuting attorney for Newaygo County at the time the state police were investigating defendant regarding the matter at hand, and that Judge Springstead had previously prosecuted defendant for sexual assault against a victim that the prosecution intended to call as a witness. After Judge Springstead's disqualification, Judge H. Kevin Drake, Newaygo County's district court judge, was assigned to sit as a circuit court judge and preside over defendant's trial. Judge Drake had bound over defendant in April 2017.

*causa sua*: no man should be the judge of his own cause. *Id.* The type of interest that triggers application of this maxim depends on the circumstances and relationships present. *In the Matters of Murchison*, 349 US 133, 136; 75 S Ct 623; 99 L Ed 2d 942 (1955); *Glass v State Highway Comm'r*, 370 Mich 482, 487; 122 NW2d 651 (1963). It has long been the practice in Michigan that judges do not review their own decisions. See *Okrie*, 306 Mich App at 470.

Under the circumstances of this case, Judge Drake's review of defendant's motion to quash the bindover arguably did not trigger the *nemo judex* maxim because the motion essentially resurrected defendant's motion for a bill of particulars, which Judge Drake acknowledged and had already denied. The gravamen of defendant's argument at the motion hearing was that, because he had not received a more precise description of the time, place, and location of the alleged sexual penetrations that served as the basis for the charges against him, it had not been established that the alleged penetrations occurred in Newaygo County, and therefore, the district court lacked jurisdiction in the matter, rendering the bindover invalid. Defendant contends on appeal that a bill of particulars is not the equivalent of a motion to quash. Although theoretically true, the argument misses the point that the contents of the two motions were essentially the same.

Even if Judge Drake's ruling on the matter created the appearance of impropriety such that he should have recused himself, defendant is not entitled to relief. Any defect in the preliminary examination is not grounds for automatic reversal "absent a showing that defendant was prejudiced at trial." *People v Hall*, 435 Mich 599, 602-603; 460 NW2d 520 (1990). The jury in the present case found defendant guilty as charged. On appeal, defendant challenges neither the sufficiency of the evidence nor that the verdict was against the great weight of the evidence. Although defendant argues that there never should have been a trial because he was entitled to immunity under MCL 722.625, we have rejected this argument.

Given that the jury's verdict extinguished any defects in the preliminary examination, defendant's challenge to Judge Drake's authority to rule on the motion is moot. See *People v Jones*, 317 Mich App 416, 431; 894 NW2d 723 (2016).

## V. JUDICIAL FACT-FINDING

Defendant submits that the trial court engaged in impermissible judicial fact-finding that allowed the trial court to impose a mandatory minimum sentence, as well as to add the punishment of lifetime electronic monitoring. We disagree.

We review a trial court's factual findings for clear error, questions of law de novo, and the trial court's decision about the sentence imposed for an abuse of discretion. *People v Wiley*, 324 Mich App 130, 165; 919 NW2d 802 (2018).

Defendant contends that the trial court made a finding of fact that the sexual abuse of the victim began in 2007, notwithstanding that the information stated that it began in 2005. This finding increased defendant's sentence by making him subject to 2006 PA 169, which mandated a 25-year mandatory minimum and lifetime electronic monitoring when the perpetrator of CSC-I is at least 17 years old and the victim is less than 13 years old. MCL 750.520b(1)(a); MCL 750.520b(2)(b). Defendant contends that this finding "overturned the facts charged in the Information and found by the jury," effectively "amend[ing] the information to charge a new crime," and that, consequently, he is entitled to resentencing without the 2006 enhancements.

However, the record reflects that the trial court did not render factual findings, but rather, the determination that defendant's sexual abuse of the victim began after 2006 is consistent with the information and the jury's verdict. The information charged defendant with committing nine counts of CSC-I "on or about 2005 to 2010," in "Big Prairie and Everett Township," in "Newaygo County." The trial court's determination that the abuse began after 2006 falls squarely within the information's assertion that the crimes occurred "on or about 2005 to 2010." In addition, the trial court instructed the jury that, in order to convict defendant, the jury had to find beyond a reasonable doubt that defendant committed the charged crimes in Newaygo County. It is well established that jurors are presumed to follow their instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). The jury heard testimony from the victim that defendant's sexual abuse began after defendant moved in with her and her family. Defendant's estranged wife testified that defendant moved in with them in March or April 2007, and that the family lived together at the Big Prairie property from then until September 2008. When questioning the victim about the sexual abuse, the prosecutor clearly delineated between activity that occurred in Newaygo County in 2007 and 2008, and activity that occurred outside of the county after they were evicted from the Big Prairie home. The fact that the jury convicted defendant of all charges necessarily means that the jury found beyond a reasonable doubt that the penetrations occurred in Newaygo County, which also means that they occurred after 2006. Accordingly, the trial court's determination that the sexual assault began after 2006 was not a judge-found-fact that increased defendant's mandatory minimum sentence, and defendant is not entitled to resentencing without the 2006 enhancements.

## VI. INADEQUACY OF NOTICE

Lastly, defendant contends that the inadequacy of the information violated his due-process rights by depriving him of a meaningful opportunity to defend himself and defeat the double-jeopardy protections guaranteed by the United States and Michigan Constitutions, warranting the reversal of his convictions. We disagree.

We review preserved constitutional claims de novo. *Wiley*, 324 Mich App at 150. "A defendant's right to adequate notice of the charges against the defendant stems from the Sixth Amendment, as applied to the states through the Due Process Clause of the Fourteenth Amendment." *People v Darden*, 230 Mich App 597, 600; 585 NW2d 27 (1998). An information provides adequate notice when it informs defendant of the charges he will have to defend against. *Id*. In determining whether the time of the offense is sufficiently specific in the information, the following factors are relevant: "(1) the nature of the crime charged; (2) the victim's ability to specify a date; (3) the prosecutor's efforts to pinpoint a date; and (4) the prejudice to the defendant in preparing a defense." *People v Naugle*, 152 Mich App 227, 233-234; 393 NW2d 592 (1986). "An information is presumed to be framed with reference to the facts disclosed at the preliminary examination." *People v Stricklin*, 162 Mich App 623, 633; 413 NW2d 457 (1987). In criminal sexual conduct cases, especially those involving children, time is not usually of the essence or a material element. *Id*. at 634.

We conclude that the information paired with the preliminary examination was constitutionally sufficient to put defendant on notice that he was being charged with criminal sexual penetrations that occurred with the victim while she and defendant were living together in Newaygo County, i.e., from 2007 to September 2008. *Naugle*, 152 Mich App at 233-234. Although the victim could not specify the exact dates of the sexual abuse, time is not an element of CSC. *Stricklin*, 162 Mich App at 633. The prosecutor's effort to pinpoint dates or to provide distinguishing details was minimal, but defendant's ability to assert a defense was not prejudiced. The record in the present case indicates that defendant advanced essentially

three defense theories: (1) the alleged acts never happened; (2) he was in a romantic relationship with the victim; and (3) he was suffering from various mental health issues. Defendant advanced the first two theories during his cross-examinations of witnesses at trial, and he implied the latter during his closing argument. He also admitted during closing argument that he sent the letter that set in motion the proceedings against him. The alleged insufficiency of notice did not prejudice any of these defense theories. Defendant's assertion that he could have provided alibi witnesses had the information been more specific is unpersuasive.

We reject defendant's reliance on *Valentine v Koneth*, 395 F3d 626 (CA 6, 2005), to support his assertion of a due-process violation because we are not persuaded that the felony information in this case was constitutionally inadequate, or that defendant's convictions should be reversed.

Affirmed.

/s/ Jonathan Tukel
/s/ Kirsten Frank Kelly
/s/ Michael F. Gadola